# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

ENZO BIBOLOTTI      §
          §
v.          §    CASE NO. 4:11-CV-472
          §    Judge Mazzant
AMERICAN HOME MORTGAGE   §
SERVICING, INC., et. al.     §

## MEMORANDUM OPINION AND ORDER

Pending before the Court are Defendants' Motion for Summary Judgment (Dkt. #53), Plaintiff's Motion for Partial Summary Judgment (Liability Only) (Dkt. #55), Defendants' Objections to, and Motion to Strike Portions of, the Affidavit of Enzo Bibolotti (Dkt. #66), and Plaintiff's Motion to Strike the Affidavit of Cindi Ellis (Dkt. #67).

## BACKGROUND

In February 2006, Plaintiff and Jessica Bibolotti sought and obtained a mortgage loan (the "Loan") in connection with the property located at 3668 Braeden Court, Middleburg, Florida 32068 (the "Property") (Dkt. #53 at Ex. A-1). The borrowers executed an Adjustable Rate Note (the "Note") in the amount of $200,000, and a Mortgage (the "Mortgage") securing the indebtedness (Dkt. #53 at Exs. A-1 and A-2).

The original lender in connection with the Loan was Option One Mortgage Corporation ("Option One"). *Id.* Option One subsequently indorsed the Note in blank and transferred the Note to Deutsche Bank National Trust Company, as trustee for Soundview Home Loan Trust 2006-OPT 2, Asset Backed Certificates, Series 2006-OPT 2 ("Deutsche"). Deutsche became the owner of the Note on April 1, 2006, and is currently the owner of the Note indorsed in blank, and the current creditor in connection with the Loan.

In July of 2008, Option One transferred the servicing rights on the Loan to American Home Mortgage Servicing, Inc. ("AHMSI"), and AHMSI began servicing the Loan. At the time the servicing was transferred to AHMSI, the Loan was current and was not in default.

On August 12, 2010, Plaintiff filed his Voluntary Chapter 7 Petition for Bankruptcy, styled *In re Bibolotti*, Case No. 10-42702, in the United States Bankruptcy Court for the Eastern District of Texas, Sherman Division (the "Bankruptcy Proceeding") (Dkt. #53 at Ex. E-2). Plaintiff contends he was current on his mortgage prior to his bankruptcy. In addition, Plaintiff vacated the Property prior to moving to Texas and prior to filing bankruptcy and did not return. Plaintiff scheduled the debt in connection with the Loan as due and owing to AHMSI, and indicated in his statement of intentions that he wished to surrender the Property (Dkt. #53 at Ex. E-2). On November 21, 2012, the Bankruptcy Court entered its Order granting Plaintiff's discharge in the Bankruptcy Proceeding. *Id.* at Ex. E-5.

Following Plaintiff's discharge, Defendants sent numerous communications to Plaintiff. On November 26, 2010, Defendant G. Moss & Associates, LLP ("Moss") sent Plaintiff one letter containing a notice of default and acceleration, and notice of opportunity to cure in connection with the foreclosure. *Id.* at Ex. B-1. This is the only communication Plaintiff alleges Moss sent. On November 26, 2010, December 28, 2010, and February 14, 2011, AHMSI and Deutsche sent Plaintiff letters regarding a loan modification under the Home Affordable Modification Program ("HAMP") or other various "loss mitigation" options. *Id.* at Exs. A-6, A-9, C-2. On January 19, 2011, February 14, 2011, August 17, 2011, February 15, 2012, and August 17, 2012, AHMSI and Deutsche sent Plaintiff letters regarding an interest rate adjustment with the Loan. *Id.* at Exs. A-9, C-1. On January 25, 2011, AHMSI and Deutsche sent Plaintiff a letter regarding insurance on the Property. *Id.* at Exs. A-9, C-3. In addition, on May 31, 2011, August 18, 2011, August

29, 2011, and August 30, 2011, representatives from AHMSI attempted to call or called Plaintiff.[1] *Id*. at Ex. A-7.  Finally, beginning in September 2010 and continuing through April of 2011, AHMSI reported Plaintiff's default history in connection with the Loan.[2]

Defendants received notice of Plaintiff's bankruptcy filing and participated in the bankruptcy by filing a motion for relief from stay.  Plaintiff did not initiate or invite any of the post-discharge communications from Defendants.  In addition, Defendants had notice that Plaintiff intended to surrender his property in bankruptcy.

On December 20, 2012, Defendants filed their Motion for Summary Judgment (Dkt. #53).  Plaintiff filed his response on January 18, 2013 (Dkt. #69).  On February 8, 2013, Defendants filed their reply (Dkt. #78).

On December 23, 2012, Plaintiff filed his Motion for Partial Summary Judgment (Liability Only) (Dkt. #55).  Moss filed its response on January 18, 2013 (Dkt. #63).  Also on January 18, 2013, AHMSI and Deutsche filed their response (Dkt. #64).  Plaintiff filed his replies to both responses on February 8, 2013 (Dkt. #74, #75).

On January 18, 2013, Defendants filed their Objections to, and Motion to Strike Portions of, the Affidavit of Enzo Bibolotti (Dkt. #66).  Plaintiff filed his response on February 8, 2013 (Dkt. #76).  Defendants filed their reply on February 19, 2013 (Dkt. #83).

Also on January 18, 2013, Plaintiff filed his Motion to Strike the Affidavit of Cindi Ellis (Dkt. #67).  Defendants filed their reply on February 8, 2013 (Dkt. #77).  Plaintiff filed his reply on February 18, 2013 (Dkt. #82).

On March 25, 2013, Plaintiff filed a Motion to Supplement Summary Judgment Record (Dkt. #85).  That motion was granted by the Court on March 29, 2013 (Dkt. #86).  On April 4,

---

[1] These dates are listed according to Defendants' statement of facts.  Plaintiff contends that more calls were made at different times.  Defendants contend that only one phone call was actually completed to Plaintiff.
[2] Defendants contend that such credit reporting activity ceased in August of 2011.

2013, Defendants filed their Motion for Leave to Supplement Summary Judgment Briefing (Dkt. #87), and additional attachments (Dkt. #88).  That motion was granted by the Court on April 5, 2013 (Dkt. #89).

## LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits "[show] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The trial court must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment.  *Casey Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981) (citations omitted).  The substantive law identifies which facts are material.  *Anderson*, 477 U.S. at 248.

The party moving for summary judgment has the burden to show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *Id.* at 247.  If the movant bears the burden of proof on a claim or defense on which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense."  *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).  But if the nonmovant bears the burden of proof, the movant may discharge its burden by showing that there is an absence of evidence to support the nonmovant's case.  *Celotex*, 477 U.S. at 325; *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000).  Once the movant has carried its burden, the nonmovant must "respond to the motion for summary

judgment by setting forth particular facts indicating there is a genuine issue for trial." *Byers*, 209

F.3d at 424 (citing *Anderson*, 477 U.S. at 248-49). The nonmovant must adduce affirmative

evidence. *Anderson*, 477 U.S. at 257. The Court must consider all of the evidence but refrain

from making any credibility determinations or weighing the evidence. *See Turner v. Baylor*

*Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

## ANALYSIS

A.    *Defendants' Objections to, and Motion to Strike Portions of, the Affidavit of Enzo*
      *Bibolotti (Dkt. #66)*

Defendants contend that the Affidavit of Enzo Bibolotti contains numerous inadmissible

and objectionable statements and exhibits. Defendants object to these statements and exhibits on

the following ground, and ask the Court to disregard them.

Defendants' first objection is that Plaintiff's credit reports and medical records are

inadmissible because they are not properly authenticated, and constitute inadmissible hearsay.

Attached to Plaintiff's Affidavit as Exhibit A are copies of all the credit alerts Plaintiff received

from a credit monitoring service, True Credit (Dkt. #55 at Ex. A). Attached as Exhibit B are

copies of Plaintiff's credit reports dated September 4, 2009, October 10, 2010, and March 30,

2012, obtained through True Credit. *Id.* at Ex. B. Finally, Attached as Exhibit C are copies of

Plaintiff's credit scores dated September 4, 2009, October 10, 2010, and March 30, 2012. *Id.* at

Ex. C.

Federal Rule of Evidence 901 requires that a proponent of an item of evidence must

produce evidence sufficient to support a finding that the item is what the proponent claims it is.

Private web-sites, however, are not self-authenticating. *See Mendoza v. Detail Solutions, LLC*,

No. 3:10-CV-2436-G, 2012 WL 6115947, at *1 (N.D. Tex. Dec. 10, 2012) (rejecting

unauthenticated internet printouts offered in support of summary judgment because the materials

did not comply with Federal Rule of Evidence 901); s*ee also Fraserside IP LLC v. Netvertising, Ltd.*, No. C11-3034-MWB, 2012 WL 4762125, at *11 n.9 (N.D. Iowa Oct. 5, 2012).  An item of evidence may be authenticated in a variety of ways, for example, with testimony of a witness with knowledge of the website or the manner in which the reports were created.  In this case, Plaintiff has made no attempt to properly authenticate these documents, and thus, the Court finds they are "of dubious evidentiary value, because they are unaccompanied by any extrinsic evidence of authenticity (such as an affidavit describing how the exhibits were put together)."  *In re Mahoney*, 369 B.R. 579, 593 (W.D. Tex. 2007).  Therefore, Defendants' objection number one to Exhibits A, B, and C of Plaintiff's partial motion for summary judgment is **SUSTAINED,** and the exhibits will be struck from the summary judgment record.  However, the Court finds no need to strike the statements in paragraph 10 of Plaintiff's affidavit on this basis.  To the extent Defendants object to paragraph 10 of Plaintiff's affidavit, the objection is **OVERRULED**.

Defendants also assert that the medical records attached to Plaintiff's affidavit as Exhibit H are inadmissible (Dkt. #55 at Ex. H).  Medical records constitute hearsay, and are inadmissible unless properly excepted under the business records exception.  FED. R. EVID. 803(6).  The medical records are not properly submitted as business records.  In addition, the medical records in Exhibit H are not certified copies, and are not authenticated with an affidavit under Federal Rule of Evidence 901.  Therefore, Defendants' objection to Exhibit H is **SUSTAINED,** and Exhibit H will be struck from the summary judgment record.  However, the Court finds Defendants' objections to the testimony of Plaintiff contained in paragraph 16 of the affidavit are **OVERRULED**.  Plaintiff may testify to his own medical issues because it is within his own personal knowledge, and it is relevant to determining whether Plaintiff suffered an injury in this case.

Next, Defendants object to a number of statements contained in Plaintiff's affidavit stating that Plaintiff lacks personal knowledge to testify "regarding Defendants' alleged motive or the reasons for their actions and communications" (Dkt. #66 at 4). However, the Court finds these statements contained in Plaintiff's affidavit are within his personal knowledge, and Plaintiff is entitled to testify regarding the fact that his credit reports reflected a debt he asserts was not owed, his interpretation of the letters sent to him by Defendants, the content of the calls he received from the call center, and his medical issues. All of these matters are clearly within the personal knowledge of Plaintiff, and thus, Defendants' objection number two is **OVERRULED**.

Next, Defendants object to the affidavit of Plaintiff as a sham affidavit. Specifically, Defendants contend that two statements made by Plaintiff in his affidavit contradict his prior testimony. A "nonmovant cannot defeat a motion for summary judgment by submitting an affidavit which contradicts, without explanation, his previous testimony." *Quicksilver Resources, Inc. v. Eagle Drilling, LLC*, No. H-08-868, 2010 WL 4115397, at *1 (S.D. Tex. Oct. 19, 2010) (citation omitted). However, the two statements objected to by Defendants do not contradict Plaintiff's prior deposition testimony. In his affidavit, Plaintiff states, "Every time I spoke with an AHMSI representative, they were trying to collect from me" (Dkt. #55 at Ex. 1, ¶ 14). Defendants contend that this contradicts with Plaintiff's prior testimony that he did not remember the substance of the phone calls, the date of the phone calls, or the person he spoke with, and Plaintiff could only remember that the AHMSI representative communicated to him that he owed money (Dkt. #66 at 5). These two statements are entirely consistent with each other. Further, during his deposition, Plaintiff stated that "all the phone calls were you owe

money.  You have to pay the money.  That's the basic language on these phone calls" (Dkt. #53 at Ex. D, 183:3-5).  This statement reflects exactly what Plaintiff explains in his affidavit.

Defendants also object to Plaintiff's statement that "In March of 2011, the stress of it all overwhelmed me, and I was taken by ambulance to the hospital… To be clear, I am not saying that the Defendants are or were the only source of stress in my life.  However, they are definitely a major contributor" (Dkt. #55 at Exhibit 1, ¶ 16).  Defendants assert that Plaintiff testified at his deposition that his separation, divorce, issues with children, his work and school schedule, and his bankruptcy were the main contributors to his stress levels.   However, this assertion mischaracterizes Plaintiff's testimony.  It is clear from the deposition transcript that Plaintiff had many stressors in his life at that time.  However, Plaintiff was not asked by counsel to list the major contributors, and was not even asked if he would consider his problems with Defendants' alleged debt collection activities a major contributor.  Therefore, the Court finds this testimony is not inconsistent, and thus, Defendants' objection number 3 is **OVERRULED**.

Next, Defendants object to several statements in Plaintiff's affidavit as conclusory, impermissible legal conclusions, hearsay, or on the basis of the Best Evidence Rule.  Defendants object to many of Plaintiff's statements arguing that they are improper legal conclusions; however, the Court finds that Plaintiff's affidavit does not contain legal conclusions, but rather, Plaintiff's statements reflect his state of mind at the time of bankruptcy, and his interpretation and expectations regarding the bankruptcy discharge.  Defendants also object on the basis of the Best Evidence Rule; however, the Court finds that the documents referred to by Plaintiff are already in evidence before the Court as attachments to either Plaintiff's or Defendants' briefs.  Therefore, the Court can review the documents as the best evidence of the statements they contain.  As to documents contained in Plaintiff's Exhibit F bearing the heading of Citizens

Property Insurance Corporation and Southern Fidelity Property and Casualty, the Court agrees that these documents have not been properly authenticated or shown that they originated from Defendants (Dtk. #55 at Ex. F, 419-439).  Therefore, as to those specific documents, Defendants' objection is **SUSTAINED,** and these pages will be struck from the summary judgment record. All other objections contained within Defendants' objection number four are **OVERRULED.**

Finally, Defendants object to the statements of fact in Plaintiff's Motion relating to Defendants' policies and procedures, as well as the excerpts of deposition testimony that are offered in support of these arguments.  Defendants contend that they are irrelevant to Plaintiff's claims.  The Court finds Defendants' objection number five is **OVERRULED**.

Therefore, Defendants' Objections to, and Motion to Strike Portions of, the Affidavit of Enzo Bibolotti (Dkt. #66) is **GRANTED IN PART** and **DENIED IN PART.**

*B.  Plaintiff's Motion to Strike Affidavit of Cindi Ellis (Dkt. #67)*

Plaintiff objects to the Affidavit of Cindi Ellis attached to Defendants' motion for summary judgment as Exhibit A.  Specifically, Plaintiff contends that Ms. Ellis was not disclosed to Plaintiff as a person with discoverable information that Defendants would rely on to support its claims and defenses.

Federal Rule of Civil Procedure 26(a)(1)(A) requires a party to provide to the other parties, "the name and, if known, the address and telephone number of each individual likely to have discoverable information – along with the subjects of that information – that the disclosing party may use to support its claims or defenses."  In addition, a party is under a duty to supplement the disclosures if the party learns additional or corrective information that has not otherwise been known to the other parties.  FED. R. CIV. P. 26(e)(1).  "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use

that information or witness to supply evidence on a motion… unless the failure was substantially justified or harmless." FED. R. CIV. P. 37(c).

In their initial disclosures, Defendants designated only the "Custodian of Records and/or Corporate Representatives" of AHMSI. The plain language of the rule clearly requires a party to disclose the names of individuals with discoverable information. Thus, Defendants' initial disclosures did not comply with the requirements of Rule 26. Further, Defendants had a duty to supplement their disclosures once they had knowledge that Ms. Ellis' testimony would be offered as a custodian of records with knowledge of the loan records and the documents offered in support of the motion for summary judgment. There is nothing precluding Defendants from having both Ms. Ellis and Ms. Lorraine Baggs ("Ms. Baggs"), AHMSI's designated corporate representative, testify regarding matters relevant to this case, provided they were both properly disclosed to Plaintiff. In this case, Ms. Ellis was not properly disclosed.

Defendants argue that they were not required to designate a corporate representative under Rule 26(a)(1)(i) in the first place because the testimony of Ms. Ellis was offered to demonstrate why Plaintiff's claims fail as a matter of law. Defendants contend that the rule only requires disclosures of a witness that a party may use to support its claims or defenses. This argument is nonsensical. Clearly, Defendants are using Ms. Ellis' testimony in support of their defenses to Plaintiff's claims.

To determine whether the failure to disclose was harmless, the Court may consider "(1) the importance of the evidence; (2) the prejudice to the opposing party of including the evidence; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation for the party's failure to disclose." *Tex. A & M Research Found. v. Magna Transp., Inc.*, 338 F.3d 394, 402 (5th Cir. 3003). As to the first factor, the Court finds that Ms. Ellis' testimony is very

important to the Defendants' case because Ms. Ellis is the authenticating witness for a large number of documents related to the loan records and documents offered in support of Defendants' motion for summary judgment. As to the second factor, the Court finds that Plaintiff would not be prejudiced by allowing a majority of Ms. Ellis' testimony. The loan records were exchanged in discovery and most of Ms. Ellis' testimony was known to Plaintiff. However, Plaintiff complains specifically of Ms. Ellis' testimony that is contrary to the testimony of AHMSI's corporate representative, Ms. Baggs. Plaintiff contends that he had no way to know that Ms. Ellis would offer materially different testimony on the dates and number of phone calls made to Plaintiff, and the extent of the credit reporting done by Defendants. The Court agrees, and finds that there is substantial prejudice to Plaintiff as to these two areas of Ms. Ellis' testimony. Defendants contend that Plaintiff had notice of the Ms. Ellis' affidavit on December 20, 2012, the date that the summary judgment motion was filed, and argue that Plaintiff had one month before the close of discovery to depose Ms. Ellis. However, the Court finds this time period too short for Plaintiff to conduct a deposition, especially given the fact that summary judgment motions had already been filed based on the previous testimony of Ms. Baggs. Further, that one-month time frame included two major holidays – Christmas and the New Year – which would have required a substantial burden on Plaintiff to accomplish another deposition in such a short time and during a major holiday season. As for the third factor, the availability of a continuance to cure the prejudice, the Court finds that a continuance is not available to the parties at this late date in the proceedings. The summary judgment motions are ripe for consideration, and the trial is scheduled for June 2013. Finally, as to the fourth factor, the explanation for the failure to disclose, the Court finds that Defendants have offered no reason why they failed to disclose Ms. Ellis, other than the fact that they are a large corporation with a

lot of employees. The Court finds this explanation insufficient for failing to disclose Ms. Ellis prior to the filing of their summary judgment motion.

Given the factors above, the Court finds that it will strike paragraph 9, except for the first two sentences. The Court will also strike paragraph 10, except for the last sentence. The Court will not strike the exhibits contained at A-7 and A-10, since Plaintiff does not assert that the documents were not produced timely. Therefore, Plaintiff's Motion to Strike the Affidavit of Cindi Ellis (Dkt. #67) is **GRANTED IN PART** and **DENIED IN PART**.

*C. Cross-Motions for Summary Judgment*

Plaintiff alleges that Defendants violated the bankruptcy discharge, the Fair Debt Collection Practices Act ("FDCPA"), the Texas Fair Debt Collection Act ("TDCA"), and the Deceptive Trade Practices Act ("DTPA"). Both Plaintiff and Defendants move for summary judgment on the basis that there are no disputed fact issues remaining between the parties. The Court will address each of Plaintiff's claims.

First, Plaintiff contends that Defendants violated the bankruptcy discharge injunction by sending correspondence, making phone calls to Plaintiff, and continuously reporting his debt as outstanding to credit reporting agencies. A discharge in bankruptcy "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived." 11 U.S.C. § 524(a)(2). "[A] violation of the post-discharge injunction may only be sanctioned through a proceeding for civil contempt." *In re Eastman*, 419 B.R. 711, 725 (W.D. Tex. 2009) (citations omitted). In order to succeed on his claim for a violation of the post-discharge injunction, Plaintiff must establish by clear and convincing evidence that: (1) a court order was in effect; (2) the order required certain conduct by the

respondent; and (3) the respondent failed to comply with the court's order. *See Whitcraft v. Brown*, 570 F.3d 268, 271-72 (5th Cir. 2009); *see also Eastman*, 419 B.R. at 725. Plaintiff must also establish by clear and convincing evidence that Defendants: (1) took an action to collect a debt; (2) the action was to collect the debt as a personal liability of the debtor; (3) Defendants had knowledge of the discharge; and (4) Defendants continued the activity despite the discharge. *Eastman*, 419 B.R. at 724-25. It is undisputed that there was a court order in effect from the bankruptcy court. The order prohibits:

> any attempt to collect from the debtor a debt that has been discharged. For example, a creditor is not permitted to contact a debtor by mail, phone, or otherwise, to file or continue a lawsuit, to attach wages or other property, or to take any other action to collect a discharged debt from the debtor… However, a creditor may have the right to enforce a valid lien, such as a mortgage or security interest, against the debtor's property after the bankruptcy, if that lien was not avoided or eliminated in the bankruptcy case.

(Dkt. #53 at E-5). It is also undisputed that Defendants had knowledge of Plaintiff's bankruptcy, as well as the discharge injunction, and they continued the activities complained of, despite the discharge. Thus, this case comes down to whether Defendants took an action to collect a debt as a personal liability of the debtor, as opposed to acting on their right to enforce a valid lien against the debtor's property, in violation of the bankruptcy court's discharge order. It appears that although this issue has been considered by many courts, "few clear rules emerge." *In re Mahoney*, 368 B.R. 579, 584 (W.D. Tex. 2007).

As an initial matter, the Court notes that the bankruptcy discharge does not eliminate the existence of a debt. "Fundamentally, a discharge merely releases the debtor from personal liability on the discharge debt; when a creditor holds a mortgage lien or other interest to secure the debt, the creditor's rights in collateral, such as foreclosure rights, survive or pass through bankruptcy." *In re Ruess*, No. DT-07-05279, 2011 WL 1522333, at *2 (Bankr. W.D. Mich.

April 12, 2011); *see also Johnson v. Home State Bank*, 501 U.S. 78, 84 (1991) (liens, unless avoided, pass through bankruptcy unaffected). Thus, upon discharge, "it is only a debtor's personal obligation to pay the debt that is effectively extinguished; the debt itself remains." *Mahoney*, 368 B.R. at 585 (citation omitted).

In addition, the Bankruptcy Code provides an exception to the discharge injunction for:

> [A]n act by a creditor that is the holder of a secured claim, if-
>> (1) such creditor retains a security interest in real property that is the principal residence of the debtor;
>> (2) such act is in the ordinary course of business between the creditor and the debtor; and
>> (3) such act is limited to seeking or obtaining periodic payments associated with a valid security interest in lieu of pursuit of in rem relief to enforce the lien.

11 U.S.C. 524(j). Defendants contend that their actions fall within this exception to the discharge injunction because Plaintiff obtained the Loan in connection with the Property, which was his principal residence at the time he obtained the Loan, the communications were sent in the ordinary course of business of servicing of the Loan, and the communications offered Plaintiff an opportunity to cure or engage in loss mitigation services if he intended to retain the Property.

Plaintiff contends that this provision is not applicable to Defendants because the Property is not Plaintiff's principal residence, and was not his principal residence at the time the bankruptcy was filed and the discharge injunction was entered. Plaintiff argues that the principal residence of the debtor should be determined at the time of bankruptcy; otherwise, Defendants would be able to circumvent the restrictions of the discharge injunction. Defendants argue that whether the principal residence of the debtor is determined at the time the loan agreement is entered into. In support of this assertion Defendants cite several cases that construe a different

provision of the Bankruptcy Code, 11 U.S.C. § 1322(b)(2). [3]   This provision refers to the contents of the plan in a Chapter 13 bankruptcy case, and provides that the plan may "modify the rights of holders of secured claims, other than a claim secured by only a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims."  11 U.S.C. § 1322(b)(2).  In the cases cited by Defendants, the courts found that the debtor's principal residence should be determined at the time the loan agreement was entered into because it would support the interest of a secured creditor by "assur[ing] that its rights under the subject mortgage could not be modified through bifurcation in a future Chapter 13 case involving its borrowers."  *In re Smart*, 214 B.R. 63, 68 (Bankr. D. Conn. 1997).  That rationale is not applicable to the statute presently before the Court, and the Court finds Defendants' cited case law inapplicable to this situation in which we have a Chapter 7 bankruptcy with no modification plan at issue.

Neither party presents the Court with case law regarding this issue.  Defendants argue that the phrase "real property that is the principal residence of the debtor," means the principal residence of the debtor as of the date the loan agreement was entered into.  Plaintiff contends that Defendants interpretation is inconsistent with the purposes of the discharge injunction and the legislative history.  The Court agrees.  The purpose of the injunction

> is to give complete effect to the discharge and to eliminate any doubt concerning the effect of the discharge as a total prohibition on debt collection efforts… The change is… intended to insure that once a debt is discharged, the debtor will not be pressured in any way to repay it.  In effect, the discharge extinguishes the debt, and creditors may not attempt to avoid that…

H. Rept. No. 95-595 to accompany H.R. 8200, 95th Cong., 1st Sess. (1977), at pp. 365-66.  Given the purposes of the discharge injunction, the exception provided in 11 U.S.C. § 524(j) makes

---

[3] Defendants cite *In re Smart*, 214 B.R. 63 (Bankr. D. Conn. 1997) (citing *In re Nobelman*, 508 U.S. 324 (1993)), *U.S. Dep't of Agr. v. Jackson,* No. 5:05-CV-20(CAR), 2005 WL 1563529, at *3 (M.D. Ga. 2005), and *In re Bulson*, 327 B.R. 830, 846 (Bankr. W.D. Mich. 2005) in support of this proposition.

sense only if the real property is the principal residence of the debtor at the time of the bankruptcy. The exception would allow a secured creditor to remain in contact with a debtor who was living in the real property as his principal residence, send communications in the regular course of business, and explore the possibility of the debtor retaining his principal residence – i.e., collecting payments in lieu of foreclosure. However, for the debtor who no longer uses the real property as his principal residence at the time of bankruptcy, even if was his principal residence at the time he entered the loan agreement, there is no need for the secured creditor to continue communicating with the debtor regarding retaining the property or negotiating some type of modification in the ordinary course of business between the creditor and debtor. Therefore, the Court finds that, at least in the context of this provision, "real property that is the principal residence of the debtor," means the property that is the principal residence of the debtor at the time of bankruptcy. It is undisputed that Plaintiff vacated the Property at issue in this case prior to filing his bankruptcy petition, and therefore, Defendants are unable to claim that this exception applies to their actions.

The parties dispute whether the Court should look at each action taken by Defendants in isolation, or review the totality of the circumstances together to determine whether the discharge injunction was violated. The Court finds that it is appropriate to look at both the individual act as well as the overall fact situation. In every case cited by both Plaintiff and Defendants, courts across the nation have considered a variety of factors in determining whether the discharge injunction was violated. For example, the court in *In re Mahoney*, used a "fanciful" example to illustrate that an act, such as sacrificing a goat, could constitute debt collection if it "is part of a larger tactic to collect a debt." 368 B.R. at 589. The court found that credit reporting activity alone did not constitute debt collection, but perhaps it could if it was considered along with other

collection activities. *Id.* The court in *In re Garske*, 287 B.R. 537, 545 (B.A.P. 9th Cir. 2002),

considered the nature of the fourteen (14) phone calls made to the plaintiff in connection with the

fact that the plaintiff wanted to retain her property, and that the creditor merely informed the

plaintiff that if she wanted to retain the property she had to make payments. The court in *In re*

*Burch*, No. C/A 09-07802-DD, 2011 WL 3207083 (D. South Carolina July 26, 2011), considered

all of the actions taken by defendant, including correspondence requesting payment, offering

opportunities for a loan modification, and repeated telephone calls harassing the plaintiff and his

parents for payment of the debt. There are many other courts that considered a variety of factors,

such as the specific plaintiff, circumstances that could make a plaintiff more or less susceptible

to repeated contacts with a defendant, the total conduct of defendants, and the coercive or

harassing effect of the conduct of defendants. Thus, the Court finds it would be remiss if it failed

to consider the facts, as they pertain to this specific Plaintiff, as well as the acts committed by

Defendants, and the overall effect such contacts may have had on Plaintiff.

Among the first of the communications sent to Plaintiff is a notice of default and intent to

accelerate letter sent by Moss (Dkt. #53 at Ex. B-1). The letter contains formal notice that

Plaintiff is in default under the terms and conditions of the Note and Security Instrument. The

letter also gives Plaintiff an opportunity to cure the default, notice of the intent to accelerate, and

notice of AHMSI's intent to foreclose on the Property. The plain language of this letter

demonstrates that it is an act to enforce the secured creditor's foreclosure rights, and is not an act

to collect the debt as a personal liability of Plaintiff. Plaintiff complains of this letter as

threatening acceleration, and requiring Plaintiff to tender payment to Defendants as an act to

collect from Plaintiff personally. Plaintiff contends that this letter could not have been an *in rem*

action against the Property, since the Property could not pay Defendants any money, only

Plaintiff could. However, the Court disagrees. This letter merely serves as notice to Plaintiff of the amount of default, and the opportunity to cure prior to acceleration, should he desire to do so. Otherwise, the letter informs Plaintiff that Defendants intend to foreclose on the Property. This letter is permissible under the discharge injunction, and appears to be precisely the type of communication the discharge injunction allows secured creditors to use in order to enforce their rights against a property *in rem*, rather than personally against a debtor. *See, e.g., In re Reuss*, No. DT-07-05279, 2011 WL 1522333, at *2 (Bankr. W.D. Mich. April 12, 2011); *Palmer v. Wells Fargo, N.A.*, No. CIV S-11-1786-KJM-CMK, 2011 WL 5838365, at *2-3 (E.D. Calif. Nov. 21, 2011) (notice of default and institution of foreclosure proceedings does not violate the discharge). Therefore, the Court finds that this is not an act to collect a debt as a personal liability of Plaintiff, and not a violation of the discharge injunction.[4]

The evidence indicates that Defendants AHMSI and Deutsche contacted or attempted to contact Plaintiff fifteen (15) times for various reasons following the discharge injunction, either by phone or by mail. Defendants sent one letter regarding insurance to Plaintiff, and a number of letters informing Plaintiff that the interest rate on the Adjustable Rate Mortgage had already changed or was going to change ("ARM Notices"). The insurance letter, dated January 25, 2011, states:

> Please be advised that [AHMSI] has recently received notification from our property inspection company that your property appears to be vacant. AHMSI is obligated to advise your insurance company of these findings.

(Dkt. #53 at Ex. C-3). There is no demand for payment, or request that any action be taken by Plaintiff at all. Therefore, the Court finds that this insurance letter does not violate the discharge injunction because it is not an act to collect a debt from Plaintiff personally.

---

[4] Because this is the only act Plaintiff alleges Moss took that violated the discharge injunction, the Court finds that Plaintiff's claims against Moss for violating the discharge injunction are dismissed.

The ARM Notices inform Plaintiff generally that the "loan will undergo an interest rate adjustment" (Dkt. #53 at Ex. C-1).  The ARM Notices provide a date, and inform Plaintiff that a new payment amount will be calculated based on the new interest rate.  The first ARM Notice, dated January 19, 2011, contains only information regarding the new interest rate, and the Court finds that this ARM Notice does not violate the discharge injunction.  However, the remaining notices, dated February 14, 2011, August 17, 2011, February 15, 2012, August 17, 2012, include additional information, such as payment and outstanding balance information.  For example, the ARM Notice dated February 14, 2011, informs Plaintiff that "the new total monthly payment, including amounts required for escrow if any, will be $1,806.55," and further states:

> Effective with the installments due on 04-01-11, the adjusted principal and interest payment will be $1,539.71.  Your outstanding principal balance is $192,650.01.  The projected principal balance on which the adjusted principal and interest payment is based is $191,213.93.

(Dkt. #53 at C-1 at 1408).  Finally, the ARM Notice contains the following statement:

> [AHMSI] is a debt collector attempting to collect a debt.  Any information obtained will be used for that purpose.  However, in the event the debt has been discharged pursuant to or the addressee or recipient is under the protection of federal bankruptcy law, this communication is solely for informational purposes and is not an attempt to collect a debt.

*Id*. at 1409.  The other ARM Notices contain the same or similar language reflecting the interest rate change, the date of the next installment due, the amount of the payment, the adjusted principal and interest payment, the outstanding principal balance, and the projected principal balance.

Further, Plaintiff received two letters regarding the HAMP program.  These letters, which the Court would describe as packets, since they included numerous forms for the borrower to fill out in order to begin the HAMP process, inform the borrower that AHMSI was willing to work with Plaintiff to make his mortgage payment affordable, and offering to help him through the

HAMP program. Defendants assert that these letters were sent solely for informational purposes. Interestingly enough, it is undisputed by the parties that Plaintiff was not ever eligible for HAMP, and would not have qualified had he been interested.

Plaintiff also received a letter on February 14, 2011, detailing various "workout options." Again, supposedly for informational purposes, the letter states "[AHMSI] would like to understand what has prevented you from making your loan payments as required by your loan documents."[5] The letter then lists out the "possible solutions" that AHMSI can offer that "could potentially help you avoid a foreclosure sale and bring your loan current." The letter gives Plaintiff the following options: (1) repayment plan; (2) loan modification; (3) short sale or pre-foreclosure sale; and (4) deed-in-lieu of foreclosure (Dkt. #53 at Ex. A-6).[6]

Defendants also contacted Plaintiff via telephone. The parties dispute the number of times Plaintiff was contacted. Plaintiff testified at deposition that he received several phone calls from AHMSI requesting payment for the debt (Dkt. #53 at Ex. D, 181:14-15). Plaintiff testified that each caller informed him that he owed money, his payments were not up-to-date, and he had to pay. *Id*. at 183:8-14. Plaintiff also testified that he told them about the bankruptcy discharge, and that they needed to contact his attorney. When questioned by counsel for Defendants, Plaintiff stated he could not remember the dates, times, specific amount of phone calls, or with whom he spoke. *Id*. at 180:7-187:22. Defendants' corporate representative, Ms. Baggs, testified that Defendants attempted to contact Plaintiff six times after August 12, 2010 (Dkt. #55 at Ex. 3, 11:3-10). She also testified that the purpose of the calls was for "loss mitigation purposes," which she clarified as "communicat[ing] to the borrower the options for potential working out

---

[5] This statement appears in the letter despite the fact that it was sent three (3) months after Plaintiff's discharge in bankruptcy, of which it is undisputed that Defendants had knowledge.

[6] The Court notes that this letter is dated the same day as one of the ARM Notices, which, as stated previously, inform Plaintiff of his current payment amount, date the payment is due, outstanding balance, and other payment information related to the loan.

modification for the loan or for the Home Affordable Mortgage program and/or possible options of short sale or deed in lieu of foreclosure." *Id*. at 12:14-23. AHMSI's records indicate that it attempted to contact Plaintiff five times by telephone (Dkt. #53 at Ex. A-7). The records indicate that four times the phone was either disconnected, met with "dead air," or no answer. *Id*. One phone call was completed on August 30, 2011. *Id*.

Finally, Defendants continuously reported Plaintiff's credit to credit bureaus as delinquent, beginning in December of 2010 and continuing every month until April of 2012 (Dkt. #53 at Ex. A-10).

The Court finds that the four ARM Notices, two HAMP packets, one "workout options" letter, one phone call to Plaintiff, and Defendants continuous credit reporting to be acts to collect a debt in violation of the discharge injunction. First, like any bill or statement sent to a debtor from a creditor, the ARM Notices contain the payment due date, the amount of payment, the outstanding balance, and the interest rate used to calculate the payment amount. In addition, the letters specifically inform Plaintiff that the installments are due and owing, and specifies the amount of the outstanding principal balance. Defendants assert that these letters were sent to Plaintiff in the course of servicing the loan, and that they were required to send such letters by the terms of the Loan documents. Defendants further contend that these letters do not contain a demand for payment, and contain effective disclaimer language. The Court finds these arguments unpersuasive. Although, Defendants are correct that they were required by the terms of the Loan documents to send notice of the new interest rate and payment amount, the other information provided by Defendants in the letters was not required by the Loan documents. This additional information and the structure of the letter transforms it from an informational letter sent to service the Loan into a letter intended to coerce Plaintiff into entering into a loan

modification or being repaying his Loan. It is disingenuous for Defendants to argue that the letters do not contain a demand for payment, when, in fact, the ARM Notices contain everything a billing statement or invoice would contain. True, the notices do not say the magic words "remit payment to" or "mail your check," or some other final statement regarding payment. However, everything else in the letters constitutes a demand for payment, and the Court will consider it as such.

The Court also considers that fact that several of these ARM Notices that demand payment and loan modification or "workout options" were sent to Plaintiff on the same day. It appears that the intent of Defendants was to demonstrate to Plaintiff how much was owed on the outstanding principal balance, what the new monthly payment amount would be, and then advise him of various loan modifications or other repayment options were available to him. In fact, Plaintiff had no remaining personal obligation on the Loan, and it was improper for Defendants to continue corresponding with him. The Court finds that these tactics were improperly coercive and could have induced Plaintiff to begin repaying on the Loan, when in fact he had no obligation to do so.

Defendants also argue that the ARM Notices, as well as the HAMP packets and February 14, 2011 loss mitigation letter, were sent for informational purposes. However, the Court questions what "information" Defendants were hoping to give Plaintiff. In bankruptcy, Plaintiff announced his intent to surrender the Property in his statement of intentions.[7] It is undisputed that Defendants were aware of this. Further, Defendants were aware that Plaintiff had vacated the Property, and was no longer residing there. In fact, Defendants obtained Plaintiff's new

_____

[7] Defendants contend that Plaintiff's statement of intentions is irrelevant because it does not alter the debtor's or trustee's rights with regard to the Property (Dkt. #53 at 21). While this may be true, the Court finds the statement of intentions relevant only to the extent that it put Defendants on notice of Plaintiff's intentions as to the Property. Clearly Plaintiff was not intending to repay the loan, enter into a loan modification, or any other relationship with Defendants. Plaintiff intended to surrender the Property in bankruptcy, and Defendants clearly had notice of this intention.

address in Dallas, Texas, and were communicating with him at that address.  Finally, Plaintiff never requested any information regarding a loan modification or any other repayment plan, and never communicated with Defendants in response to their constant correspondence.  In fact, Defendants' intent is illuminated in the testimony by Ms. Baggs, Defendants' corporate representative, who explained that this information is given in the event that "they have changed their mind and they decide they want to continue to make payments on the property" (Dkt. #55 at Ex. 3, 20:9-11).  The Court finds that it is an impermissible violation of the discharge injunction to continuously send information regarding loan modifications, possible repayment plans, or other so-called "informational" letters with the underlying intent that Plaintiff would begin repaying the debt as a personal liability.

All of the correspondence sent to Plaintiff by Defendants contains the following language:

> [AHMSI] is a debt collector attempting to collect a debt.  Any information obtained will be used for that purpose.  However, in the event the debt has been discharged pursuant to or the addressee or recipient is under the protection of federal bankruptcy law, this communication is solely for informational purposes and is not an attempt to collect a debt.

Defendants contend that this language is highly persuasive evidence that Defendants did not violate the discharge injunction.  In *In re Bruce*, No. 00-50556 C-7, 2000 WL 33673773, at *4 (Bankr. M.D.N.C. Nov. 7, 2000), the bankruptcy court found a mortgage company in civil contempt for knowingly and willfully violating the discharge injunction by continuing to send the debtor requests for payment and telephoning the debtor at his place of employment.  "In [*In re Bruce*], after the mortgage company (1) received notice that the [d]ebtor vacated the property, (2) obtained relief from stay to proceed with foreclosure, and (3) received notice of the debtor's discharge, it mailed mortgage loan statements to the debtor."  *In re Brown*, 481 B.R. 351, 360

(Bankr. W.D. Pa. 2012). The statements the debtor received contained disclaimer language acknowledging the bankruptcy case and indicating that they were not demands for payment, and included payment coupons showing current payments due and the current due dates. In addition, the lender was made aware that the debtor moved, it continued to send notices offering the debtor assistance to keep him home. *Id*. However, other courts have held that disclaimer language that was in a "conspicuously outlined box" on a statement was not an attempt to collect a debt. *See In re Schatz*, 452 B.R. 544, 549 (Bankr. M.D. Pa. 2012). The court found it significant that the statement did not indicate the amount as being past due, did not demand immediate payment, and did not threaten consequences for the debtor's failure to act. *Id*.

In the present case, Defendants (1) had knowledge that Plaintiff vacated the Property, and have had that knowledge for a significant period of time; (2) obtained relief from the bankruptcy stay to proceed with foreclosure; and (3) received notice of the debtor's discharge. Further, Defendants sent multiple communications to Plaintiff requesting that he consider a loan modification, informing him of the outstanding balance of the loan and payment dates, and advising him that there were a variety of "workout options" available should he "change his mind." Although the letters do contain the disclaimer language, the Court finds that this language is not conspicuously located, in fact, the language is located at the end of the letter on the second page, and is not distinguishable in any way from the other text contained in the letter. Further, the some of the letters indicate that there is a past due amount, an outstanding balance, and the payment dates. The disclaimer language basically amounts to an admission that it is an attempt to collect a debt, unless, of course, the debtor is under the protection of federal bankruptcy law. In that case, the letter is merely for informational purposes. Thus, the Court

finds this language is insufficient to make these communications permissible communications under the discharge injunction.

Plaintiff also asserts that during this time he received multiple phone calls from Defendants attempting to collect money. As stated above, Defendants dispute this fact. Ms. Baggs testified that Defendants called Plaintiff approximately five (5) or six (6) times to discuss loss mitigation options. In addition, Defendants' records show that while they attempted to contact Plaintiff several times, only one phone call on March 31, 2011, reached a person. The parties dispute whether this call was for loss mitigation or collection purposes. However, the Court finds that under these circumstances, even if the call was for loss mitigation purposes, the phone call violated the discharge injunction. Plaintiff was, quite frankly, bombarded by "loss mitigation" information. To be clear, this information would not have mitigated Plaintiff's loss in any way, it was purely for the benefit of Defendants. Based on the amount of communication, the Court can only assume that Defendants were attempting to collect a debt from Plaintiff as a personal liability, and there was no other reason for the repeated communications.

Plaintiff also asserts that Defendants continuously reported his debt to credit bureaus as delinquent beginning on January 5, 2011, and continuing every month until April 5, 2012. The Court agrees that "the mere reporting of credit information about a debtor *vel non* is not an 'act' to collect a discharged debt within the meaning of the statute, unless the evidence shows… that there is a linkage between the act of reporting and the collection or recovery of the discharged debt." *In re Mahoney*, 368 B.R. at 584. In other words, "[t]he act of credit reporting could be part of a larger course of conduct that, taken together, might constitute an act likely to be effective to collect a debt." *Id*. at 589. The Court finds that in this case, the continuous credit reporting, combined with the constant communications regarding "loss mitigation" options, and

the ARM Notices that continued to remind Plaintiff of the changing interest rate, payment amount, payment due date, and the outstanding principal balance due, that this is a larger course of conduct intended by Defendants to coerce Plaintiff into "voluntarily" making payments or entering into a loan modification or other repayment plan with Defendants.  In addition, the Court finds that these acts are likely effective as measures to collect on the debt.  It is clear from the testimony of Plaintiff that he made all payments up until the time of bankruptcy on the Loan. Plaintiff struggled after filing bankruptcy with improving his credit score, and the communications sent by Defendants could have coerced Plaintiff into entering into a new relationship with Defendants if he believed that it would help improve his credit and get him back on his feet.  Therefore, the Court finds that Defendants' continuous reporting of Plaintiff's debt as delinquent is also a violation of the bankruptcy discharge.

Defendants argue that the Court should not find in favor of Plaintiff because it is contrary to the law, the Bankruptcy Code, and has dangerous policy implications (Dkt. #64 at 18). Defendants contend that if the Court finds in favor of Plaintiff, it would eliminate a creditor's ability to service a loan or pursue its rights *in rem* in connection with a lien that survives bankruptcy.  *Id*.  In addition, Defendants argue that a finding in favor of Plaintiff would prohibit a lender from communicating with a borrower at all.  However, this is not accurate.  The Court in no way is precluding Defendants from sending communications regarding servicing a loan or pursuing its rights *in rem*, in a way that does not violate the bankruptcy discharge injunction.  In fact, the Court found that some of Defendants' communications were permissible.  However, Defendants should be more cautious about the types of correspondence, the contents of the correspondence, phone calls, and number of times they report misleading credit information regarding a debtor following the discharge injunction.  Defendants contend that it was necessary

for them to send information to Plaintiff because it was unaware what the intentions of both Plaintiff and his ex-wife were as to the Property. The Court finds this argument unpersuasive. Plaintiff clearly surrendered the Property in bankruptcy, the home was vacant, and the correspondence sent to Plaintiff was addressed to both of them and sent to his address. Further, Plaintiff and his ex-wife were clearly in default and the Property was vacant for a significant period of time. It does not appear that Defendants ever sent Plaintiff or his ex-wife a letter asking them what their intentions were, and the Court finds that it is disingenuous for Defendants to argue that their post-discharge communications were solely for the purpose of finding out what the borrowers' intentions were for the Property. Defendants could have foreclosed on the Property and exercised their *in rem* rights. It absolutely does not matter what either Plaintiff or his ex-wife's intentions were as to the Property. Finally, Defendants argue that this will prevent lenders from offering information about loan modifications to borrowers in bankruptcy. However, this statement is also inaccurate. The Court's findings are based entirely on the facts and circumstances of this case. If Defendants are correct in stating that many debtors do wish to receive information about loan modifications in bankruptcy, there is nothing in the order prohibiting Defendants from providing a debtor with this information. However, there are a few facts in this case, which makes it impermissible for Defendants to send communications to this Plaintiff regarding loan modifications. First, Plaintiff did not request this information. Second, the Property had been vacant for a significant period of time, and Defendants had knowledge of the vacancy. Third, the sheer number of "loss mitigation" or loan modification correspondence sent in this case, combined with the ARM Notices that basically amounted to a demand for payment. Fourth, Plaintiff never did and would never have qualified for a loan modification. These facts lead the Court to the conclusion that there was simply no reason for Defendants to

send these documents to this Plaintiff.  It certainly does not preclude Defendants from contacting other debtors in bankruptcy under a different fact situation.

In conclusion, for the above-mentioned reasons, the Court finds that Defendants violated the post-discharge injunction by sending ARM Notices that amounted to an act to collect a debt, repeated "loss mitigation" letters, a phone call discussing "loss mitigation," and continuing in repeated and misleading credit reporting activity.  The Court will now turn to Plaintiff's remaining claims.

Plaintiff alleges that Defendants' post-discharge communications violated the FDCPA. Defendants move for summary judgment on these claims, asserting that they are not "debt collectors" as defined by the FDCPA.  "Only parties who meet the statutory definition of debt collector are subject to civil liability under the FDCPA."  *Vick v. NCO Fin. Sys., Inc.*, No. 2:09-CV-114-TWJ-CE, 2011 WL 1193027, at *2 (E.D. Tex. Mar. 7, 2011).  The FDCPA's definition of debt collector "does not include the consumer's creditors, a mortgage servicing company, or an assignee of a debt, as long as the debt was not in default at the time it was assigned." *Perry v. Stewart Title Co.*, 756 F.2d 1197, 1208 (5th Cir.), *modified on other grounds*, 761 F.2d 237 (5th Cir. 1985).  In the present case, AHMSI is the mortgage servicing company, and the Loan was not in default at the time the servicing was transferred to AHMSI.  Therefore, AHMSI is not a debt collector for purposes of the FDCPA.  Further, Deutsche is the creditor in connection with the Loan, and thus, is not a debt collector for the purposes of the FDCPA.  Therefore, the Court finds Plaintiff's claims under the FDCPA against AHMSI and Deutsche should be dismissed since neither Defendant is a debt collector.

Defendant Moss was retained for the purpose of sending the foreclosure notice of default and acceleration, and Moss did not send Plaintiff any other communications.  The Court finds

that this is not debt collection activity under the FDCPA. *See, e.g., Brown v. Morris*, 243 F. App'x 31, 35 (5th Cir. 2007) (affirming jury's determination that initiating foreclosure did not constitute debt collection); *Sweet v. Wachovia Bank and Trust Co*., N.A., No. 3:03-CV-1212-R, 2004 WL 1238180, at *2 (N.D. Tex. Feb. 26, 2004) (foreclosure proceedings are not debt collection under the FDCPA); *Bittinger v. Wells Fargo Bank, NA*, 744 F. Supp. 2d 619, 626 (S.D. Tex. 2010) ("The activity of foreclosing on a property pursuant to a deed of trust is not the collection of debt within the meaning of the FDCPA."). Therefore, the Court finds that Plaintiff's claims under the FDCPA against Moss should be dismissed because sending the notice of default and acceleration letter is not debt collection under the FDCPA.

Defendants assert that Plaintiff's claims under the Texas Fair Debt Collection Practices Act ("TDCA") fail as a matter of law because Defendants have not violated the Act. TEX. FIN. CODE § 392.001, et seq.

Plaintiff asserts violations of the Texas Finance Code, Sections 392.304(4), 392.304(a)(4), 392.304(a)(6), 392.304(a)(8) and (19). Plaintiff contends that violating the discharge injunction is a *per se* violation of the TDCA, and that Defendants' continuous "false derogatory" reporting of Plaintiff's delinquency to the credit bureaus violated the TDCA.

The TDCA prohibits debt collectors from using threats, coercion, or other wrongful practices in the collection of consumer debts. *See Brown v. Oaklawn Bank*, 718 S.W.2d 678, 680 (Tex. 1986). In order to state a claim under the TDCA, Plaintiff must show: (1) the debt at issue is a consumer debt; (2) Defendants are debt collectors within the meaning of the TDCA; (3) Defendants committed a wrongful act in violation of the TDCA; (4) the wrongful act was committed against Plaintiff; and (5) Plaintiff was injured as a result of Defendants' wrongful act. *See* TEX. FIN. CODE § 392.001, et seq. The TDCA does not prevent a debt collector from

"exercising or threatening to exercise a statutory or contractual right of seizure, repossession, or sale that does not require court proceedings." TEX. FIN. CODE § 392.301(b)(3); *Sweet*, 2004 WL 1238180, at *3.

There is no evidence that Defendants threatened to take an action prohibited by law. TEX. FIN. CODE § 392.301(a)(8). There is also no evidence that Defendants failed to disclose the name of the person for whom the debt was assigned or owed, that Defendants used a written communication that failed to indicate clearly the name of the debt collector and the debt collector's street address, or that Defendants used a written communication that demands a response to a place other than the debt collector's or creditor's street address. TEX. FIN. CODE §§ 392.304(a)(4), 392.304(a)(6), 392.304(a)(7). In addition, Plaintiff has no evidence that Defendants made repeated or continuous telephone calls. TEX. FIN. CODE § 392.302(4). The only evidence in the record is that Defendants completed one phone call to Plaintiff. Therefore, the Court finds that these sections cannot be the basis for a violation of the TDCA.

Section 392.304(a)(8) states, "in debt collection or obtaining information concerning a consumer, a debt collector may not use a fraudulent, deceptive, or misleading representation that… misrepresent[s] the character, extent, or amount of a consumer debt." For a statement to constitute a misrepresentation under the TDCA, Defendants must have made a false or misleading assertion. *Reynolds v. Sw. Bell Tel., L.P.*, No. 2-05-356-CV, 2006 WL 1791606, at *7 (Tex. App. – Ft. Worth June 29, 2006, pet. denied). Plaintiff contends that Defendants' continuous reporting of the Loan as delinquent to credit bureaus is a misleading assertion regarding the character, extent, or amount of a consumer debt. It is undisputed that the Loan was in default and Defendants did not misrepresent the amount of the debt. The statute requires that the misrepresentation be made in debt collection or in obtaining information concerning a

consumer. TEX. FIN. CODE § 392.304(a)(8). However, as discussed above, credit reporting itself is not debt collection and Defendants were not obtaining information concerning a consumer. Therefore, the Court finds that the mere reporting of the debt to credit bureaus as delinquent is not sufficient to support a claim for violating the TDCA.

Further, Plaintiff has no evidence that he suffered any injury as a result of the credit reporting. Plaintiff contends that as a result of this activity he was rejected multiple times for a car loan, and had an artificially lower credit score. However, this is not sufficient to show an actual injury. The evidence reveals that Plaintiff did receive the car loan after multiple attempts to obtain one, and has not alleged that his artificially lower credit score has prevented him from obtaining any other type of loan. Thus, the Court finds that Plaintiff no evidence of actual damages suffered as a result of Defendants credit reporting, and his claims against the Defendants under the TDCA are dismissed.

Finally, Defendants move for summary judgment on Plaintiff's claims under the DTPA asserting that Plaintiff is not a consumer. Plaintiff does not respond to Defendants' arguments and does not move for summary judgment on this claim. The Court agrees that Plaintiff is not a "consumer" as defined by the DTPA. To qualify as a consumer under the DTPA, a plaintiff must (1) seek or acquire goods or services and (2) the goods or services purchased or leased must form the basis of the complaint. *Modelist v. Deutsche Bank Nat. Trust Co.*, No. H-05-1180, 2006 WL 2792196, at *7 (S.D. Tex. Aug. 25, 2006) (citing *Sherman Simon Enters., Inc. v. Lorac Serv. Corp.*, 724 S.W.2d 13, 14 (Tex. 1987)). In evaluating whether Plaintiff is a consumer under the DTPA, the Court must look to the object of the transaction. TEX. BUS. & COM. CODE § 17.45; *La Sara Grain Co. v. First Nat'l Bank of Mercedes*, 673 S.W.2d 558, 567 (Tex. 1984). In *La Sara Gran Company*, the Texas Supreme Court held that a lender may be subject to a DTPA

claim if the borrower's "objective" was the purchase or lease of a good or service. *La Sara Grain Co.*, 73 S.W.2d at 567. However, a person whose objective is merely to borrow money is not a consumer because the lending of money does not involve either the purchase or lease of a good or service. *Riverside Nat'l Bank v. Lewis*, 603 S.W.2d 169, 173 (Tex. 1980).

In the present case, it is undisputed that Plaintiff's claims arise out of a loan and do not involve the purchase or lease of either goods or services. Plaintiff did not seek to purchase any goods or services from Defendants. Therefore, Plaintiff is not a "consumer" with respect to the Loan, and therefore, this claim must be dismissed as a matter of law.

## CONCLUSION

Based on the foregoing, it is **ORDERED** that Defendants' Objections to, and Motion to Strike Portions of, the Affidavit of Enzo Bibolotti (Dkt. #66) is **GRANTED IN PART** and **DENIED IN PART**, and Plaintiff's Motion to Strike the Affidavit of Cindi Ellis (Dkt. #67) is **GRANTED IN PART** and **DENIED IN PART**.

It is further **ORDERED** that Defendants' Motion for Summary Judgment (Dkt. #53) is **GRANTED IN PART** and **DENIED IN PART** and Plaintiff's Motion for Partial Summary Judgment (Liability Only) (Dkt. #55) is **GRANTED IN PART** and **DENIED IN PART**. The Court finds that Defendants AHMSI and Deutsche violated the discharge injunction and are found to be in civil contempt. The Court further finds that Plaintiff's claims arising under the FDCPA, TDCA, and DTPA are dismissed.

It is further **ORDERED** that within fourteen (14) days of this Order, Plaintiff shall file a brief discussing an appropriate sanctions award. Similarly, within fourteen (14) days of the filing of Plaintiff's brief, Defendants may file a response. Within five (5) days of the filing of Defendants' response, Plaintiff may file a reply. Within five (5) days of the filing of Plaintiff's

reply, Defendants may file a sur-reply.  The Court will enter a separate judgment consistent with this opinion.

**IT IS SO ORDERED.**

**SIGNED this 15th day of May, 2013.**


AMOS L. MAZZANT
UNITED STATES MAGISTRATE JUDGE